Thank you, your honors. My name is Jim West and I'll be speaking on behalf of the appellant, Neal. At this threshold, I would like to reserve four minutes for rebuttal. Your honors, when I first got this case as an appointment under the Criminal Justice Act, it looked like a defense counsel's dream. And there have been on-mirandarized statements taken at the beginning. It exercises mirandarites and a statement had been taken anyway. And there was a law passed by Congress saying that the statement should be taken within six hours, and it was almost 24 hours before the statement was taken, after the mirandarites had been invoked and after he was again approached. And the only thing I thought that could be left is if they didn't put the address on the search warrant. When I got the search warrant, it didn't have the address on it. And so we have a couple of issues here. One involves his statements. The other involves the search of his residence. And I'd like to strip it away because the brief came fairly wordy. And I think there's an essence here in both of those that's very, very important insofar as this particular defendant is concerned and criminal law generally is concerned. And insofar as Congress's statute, Section 3501, that is really in the hands of the gods. The Supreme Court has granted cert to the Corley case, and I think we're going to know what 3501 says. Your Honor? I said which I'm familiar with. Yes, Your Honor. It was you dissented in the Corley case, and I'm sort of rooting for the dissent in that particular case. Well, we'll see. The circuits are split on the issue. Yeah. But I think they will be deciding it, and they may very well decide that six hours means six hours, that given the passage of Section 3501 and the time it was passed, it was an attempt to ameliorate, really, the Supreme Court's decisions that were limiting the amount of time that could pass before a confession was given and to create a six-hour safe harbor in which law enforcement could take a confession. And that six-hour safe harbor was violated here. Of course, they might find something else, too, when they discern it. But I think we're all going to know in about six months. But more important than that, when you strip everything away in this particular case, and even putting aside the six-hour rule and what's going to occur there, I respectfully submit that the district judge's findings insofar as the second statement being taken after the defendant invoked his Miranda rights was initiated by the defendant, is simply not supported. I did a fact-intensive brief, and I tried to cover the witnesses at the suppression hearing individually. And the facts are there with good sights insofar as pages of the transcript. But basically, what happened is a day after the robbery occurred and the defendant was transported back to Harrisburg, Pennsylvania, by the FBI case agent that was conducting the investigation, nothing was said. The case agent knew he had invoked his Miranda rights the evening before. They got back to the FBI office, and they went to the interrogation room, ostensibly to take his fingerprints. The fingerprint machine was broken. They didn't take him to the marshal's office where a fingerprint machine did exist and was available. But they stayed in the FBI office, and after a long hiatus, the agent said to him, what are those red marks on your neck? And he agreed that he had tried to commit suicide twice the night before as a young man, and this was his second bank robbery. His first was when he was 18. He just got out of jail. He knew what he faced here. And to me, that was the initiation of interrogation. The wicked flu when no one pursues. And here, there was an admission that the defendant had tried to commit suicide twice the night before after being arrested for bank robbery, and I could see as a defense attorney that coming up in a trial, that admission that I asked him what those red marks were, and he said he twice tried to commit suicide the night before, and ah-ha, see what that shows. That shows guilt. If I could interrupt you just a minute, help me out. Yes, Your Honor. As you know, the district court found that under all of the circumstances, the question about what are those marks on your neck, one under those circumstances and the position of that officer would not anticipate an incriminating response. Now, by what standard do we review that finding? He said the officer was concerned about his safety and his health, and somebody... Obviously, it's clearly Roney's standard. There's a common sense overlay there. The operative facts are not really in dispute, and the question is what inference is drawn from the operative facts. When you say to somebody with two red marks around their neck, you know, what are those, and he replies, you know what they are, and the agent responds, well, this isn't a capital case, this isn't worth it. To me, there's been a significant admission made, and moreover, it wasn't turned over to the marshal's office to say put him on a suicide watch. Perry County Prison, where he was housed under federal contract, was not notified. The defendant's father, and this is at the evidentiary hearing, his father works for Washington Post, and his father testified, I called Perry County Prison after I talked to my son and put him on a suicide watch that night after he arrived back in Harrisburg, and they didn't know that he tried to commit suicide twice the night before. It was literally an icebreaker, and I'm not criticizing the agents. I mean, they're trained to do that type of thing, but this was not the defendant initiating a conversation. I don't think you answered Judge Stapleton's question as to how we should review that finding by the district court. I think it's a clearly erroneous finding, and I think that when you add up all the facts, the totality of the facts. In your position, it is clearly erroneous? Yes. I'm submitting that, let's put it this way, I think it's more a plenary review because given that fact, FBI agents says to a defendant, what are those red marks on your neck? Without trying to go into what his intent was and the facts and circumstances of this case, it's an interrogation about the bank robber. It's saying, you know, did you try to commit suicide the night before? But the follow-up, Your Honor, Judge Tishima, I think is equally important because the next thing that is said is the defendant says, what am I charged with? And we all know Rule 5, and one of the basics is you always tell somebody what you're charged with. The judge found, it was stated two ways at the hearing, he said, what's going to happen to me? It was one or the other, but both ways it was testified to. And they said to him, we can't talk to you because you took your Miranda rights. If you waive Miranda, we'll tell you. I mean, what if it had said one time's lunch? What if it had said, where's the bathroom? I mean, all he said was, what's going to happen to me or what am I charged with? And they say back on somebody that's exerted Miranda, said, I don't want to talk. And they've said, we can't tell you that. Well, there's no rule of law that says the FBI cannot tell him that. What was happening there was the agent, being a good agent, and he testified, in fact, in response to a question from the judge, because my questions were objected to, he testified I was being a good agent, not a good social worker. I was investigating this case. And yes, verily, he was investigating the case. And he demanded a quid pro quo for, it wasn't quite a Hobbs Act violation, but he demanded a quid pro quo in exchange for talking to the defendant. And that was waiving his rights in exchange for giving him information. Then the next thing that happens is something Miranda talked a lot about, trickery. They indicated to him, you can help yourself by talking. Now, that's pretty standard stuff. You can help yourself by talking. But in this case, it was the furthest from the truth that anything could be. This gentleman had a 924C conviction in Baltimore for bank robbery when he was 18 years old. This was his second 924C, which is the most onerous of mandatory minimums ever passed anywhere. 25 years mandatory minimum on top of whatever sentence is imposed for the base crime for bank robbery he was facing, 45 years. To tell him you could only help yourself by talking is an incredible misrepresentation when it's all stripped away. As a matter of fact, he hung himself by talking. And to add insult to injury, the next thing that occurs, what I put in the nature of trickery, is to tell him, if you write a letter to the tellers apologizing, it will help you. And he did. And by the way, this is, I think, the second time I've seen this in the middle district of Pennsylvania. It's become sort of a technique. And he wrote a letter of apology, pouring his heart out to the tellers, how he did not mean to scare them. Of course, the letter was never delivered. And it was never intended to be delivered. It was his written confession. This, from someone who was- You have a limited amount of time. And I wonder if you want to go to the warrant issue. I do. And I will. I see you're yelling. That is my second prong. What was wrong with the warrant? What were the errors or omissions? I see your red lights on. Every search warrant- Well, are your red lights on now, Mr. Reznor? Your Honor? Your red lights on. Oh, I'm very sorry. Can I just say that for a second? Yeah, well, I'll give you- It'll be very quick. Yes, I think we want to hear you on the warrant issue. I mean, that's why I tried to move you from the Miranda. Go ahead. I'm very sorry, Your Honor. And let me just say this on the warrant issue. I think it's equally, if not more important, that warrant does not contain the address. That's the essence of any warrant. You can go back to medieval times. The place to be searched is absolutely the sine qua non of any search warrant that was ever issued by any magistrate, whether it was in England or here or wherever. And it's not there. Or we can go to the second level and say, but the affidavit has the address in it. Well, the affidavit doesn't have the address in it because the affidavit says he lives at 1513 Blank Street. I forget the name of it. And we found that in the records of Enterprise Rent-A-Car. Well, we got the records of Enterprise Rent-A-Car. That's not the address that's on those records. The address on those records is his mother's address. He was just released from prison. Everything had gone to his mother. His driver's license was under his mother's address. It was his address, though. Your Honor? It was his address. It was his address from the on-Mirandize interrogation. That's the only place they could have gotten it. My father's giving me a house. I'm fixing it up. I'm painting it. I'm living there. I sleep upstairs. I don't go back to Mom's house at night. I've been living there for a couple of weeks. So that's how they had to get it. But that's not what the warrant says. And the magistrate was entitled to an address and how they came by that address. Those are the essence of any warrant so that they don't search our houses or somebody's house by mistake. If something has to be right, it has to be that address. Mr. West. And it wasn't right. Mr. West, if the Supreme Court were to reverse the majority opinion in Corley, would that be dispositive of your appeal? I say yes. And I say yes because if they do it on the right basis, Congress attempted to ameliorate the Malloy rule and they did that by setting up a six-hour safe harbor. So the confession would be suppressed? Absolutely. I'm hoping for that. Well, we don't know what will happen. Okay. Thank you very much. And I apologize for going over the time. We'll get you on rebuttal. Thank you. Mr. Smith. May it please the Court. I'm Ted Smith, an Assistant United States Attorney for the Middle District of Pennsylvania, representing the United States of America, the appellee. I will go wherever the Court wants me to go. I propose to begin by answering Judge Sloviter's last question regarding what would happen if the Supreme Court were to overrule Corley.   We don't know what they're going to do. I'm not very good at reading the tea leaves. Neither am I. But if they were to overrule Corley, my answer to the question is not the same as Mr. West's because Corley is readily distinguishable on the facts from this case on two grounds. And the most important, I think, is that in Corley, this Court held, following its earlier decision in Giroux, that the only thing that mattered was voluntariness. And I think looking at Congress's statute, it is possible to say that the Court erred in so finding. You mean our Court. Our Court held. It's possible for one to argue. I sure thought so. I know you thought so, Your Honor. It's possible for one to argue. I don't want to undercut the Corley decision, obviously. But it's possible to argue, well, no, you don't just look at voluntariness. If it's over six hours, you also have to look at what the statute says, which is, what is the time delay reasonable taking into consideration the travel issues, okay? And the judge here did that. The judge here looked at the travel time between Frederick and Harrisburg and Frederick and Baltimore and said that while the distance was about 20 miles shorter from Frederick to Baltimore, because Baltimore is a big city and traffic and so forth, the travel time was roughly the same. The other factual distinction between this case and Corley is that in this case, the defendant got not just the functional equivalent, but I think he got an initial appearance that night in the Frederick Detention Center from a state judicial officer under a procedure that it appears was set up in Maryland for precisely this sort of situation where somebody got arrested in Frederick. They didn't want to have to take him all the way into Baltimore and lodge him in the maximum security detention center there. They want to put him in the Frederick County Detention Center. You need a commitment to put somebody in a detention facility. So what are we going to do? We're going to take him in front of a county or a state commissioner, and that's what they did here. Let me ask you this. Now, whatever the proceeding was before that commissioner, was it substantially the same as what would happen before a magistrate? Yes. The only difference being he was not admitted to bail there. He was told that the bail decision would be made when he had his federal initial appearance. But the advice of the rights, the advice of the charges, Mr. West says that they wouldn't tell him what he was charged with without his waving his Miranda rights. That's not true. He had been told the night before, he had been told by the agents, you're charged with bank robbery. He had been told by the commissioner at the Frederick County Detention Center, you're charged with bank robbery. He knew he was charged with bank robbery. His question to the officer or to the agents was, I'm concerned about what's going to happen to me. And you know what their answer was? It wasn't you have to wave Miranda. Their answer was, well, you're going for an initial appearance in about an hour and a half in front of Judge Smizer. Didn't he say that he thought he was being detained because the rental automobile had been returned late? That it was at the very beginning, he thought that the reason the police had shown up to the Enterprise rental facility was that the rental car had been returned late. But in fact, didn't the agents tell that to somebody? Either the rental agent or to him? No, the rental agency held him up for a long period of time because they had called the FBI up in Harrisburg and they had also called 911. So they were waiting for the police to come because they knew that the person who had rented, they knew that their car had been used as a getaway car in a bank robbery up in Harrisburg. So they delayed him and led him to believe that the reason they were delaying him was that and had something to do with the check that he was presenting for the overcharges for the long rental. And they did that, obviously, because if they convey to him that we know you've committed a robbery and we're calling the police, he's going to be out of there. So they tried to delay him. And he said he sort of knew they were trying to delay him, but he thought that it was all over the late rental, not over the bank robbery. And when the police showed up and committed what I would think of as a Terry stop, I mean, they eliminated the other people or got the other people out of the room and then they asked him two questions, okay? I think that was a Terry stop. I don't think they had decided yet they were going to arrest him for a bank robbery. They weren't letting him go until he gave them some answer to the questions. But when you have a bank robbery committed in a rental car, you sort of assume that the person who committed the bank robbery is the person who's returning the rental car. But if they answer the question, well, if he had said, no, I just, I picked the car up for my brother. He had the car all day. Well, then you know that you might have the wrong person. So they're asking questions just designed to eliminate the possibility that this is the wrong person. Mr. Smith, let me move you, because there are several issues in this case. They searched without a warrant, right? No. There was no warrantless search? There was no warrantless search. They were getting a warrant. They entered the premises because... Yeah, but they went into the house before they had the warrant. Correct, they did not search. There's no indication they searched for anything other. Not even a protective search? Yes, there was a search to eliminate the possibility of there being a person in that premises. So there was a search? I said, well, I called it a protective sweep. I don't think it's considered a search. Let me ask you, how can we deter violation of someone's Fourth Amendment rights who makes us, if the police can make a search without a warrant, if we can't sanction that by suppressing the evidence? I mean, isn't the whole point of this that we should be able to suppress the evidence so that your officers don't make whatever kind of search? I mean, they went in and they didn't have a warrant. They had a basis for doing that. I mean, the courts, including this court, have said that protective sweeps are permissible. And here, the Sergeant DeGrange knew that the defendant was trying to reach somebody at that house. That's what he testified to. Okay? And for that reason, while he applied for a search warrant, he sent two officers over to the house to make sure that there wasn't anybody in there trying to destroy evidence. And they went in, they removed the one person, they took his identification from him, they then brought him back in. One officer, not agent, one police officer, sat with him downstairs while the other went upstairs and simply went through the place and made sure there was nobody else there. The officer who was sitting down there with the occupant was paging through magazines and looking at a football playbook that he picked up off, I think, the television set. Okay? But just as importantly, in answer to your question about whether you should suppress, let's say they had committed a search. Okay? Let's say they had been rummaging around looking for evidence. None of that found its way onto the warrant. None of that, nothing they did inside there tainted the warrant. The only piece of information that was conveyed by the uniformed officers who did the protective sweep to Sergeant DeGrange was the premise's description. Now, they already had the address, which, by the way, was in the affidavit. And the affidavit was incorporated into the warrant and served with the warrant. So the address was in the warrant. When did they find the firearm? In the search pursuant to the warrant. Not in the first? Not in the protective sweep. And the court correctly found, therefore, that any evidence, if there was a, the court didn't decide whether that was a Fourth Amendment violation because the court found it very easy to say even if this was a Fourth Amendment violation, there was no harm resulting from it because no evidence was gained that ended up being used against the defendant. The only thing. Well, yeah, but that doesn't mean that our obligation ends if they, at the time they get the warrant, they don't, that they don't use anything beforehand. We really, we have to find some way to deter police from making unwarranted searches. And they did not make an unwarranted search here. Well, unwarranted by which I mean not necessary, but unwarranted without a warrant. Well, no, and I understand that. I do not think that this protective sweep was a warrantless search. I think it was intended to preserve the status quo ante at that premises while they obtained what they knew they needed to obtain in order to do an actual search, which was a warrant. But beyond that, I gather your position also is there are no fruits of that sweep to be suppressed anyway. There's no fruits of that sweep to be suppressed because nothing from that, nothing from that sweep contributed to the warrant which, which Sergeant DeGrange was already attempting to get. The courts have held that the independent source rule is not satisfied if, for instance, the police were motivated to get the search warrant as a result of something that the officers find during the warrantless entry. But that's not the case here. Sergeant DeGrange was attempting to get a warrant. So, so, so we don't have that situation. And so, Your Honor, I'm sorry. I don't think there was any police misconduct. But if you find there was, I don't think this is a case where, where there's any deterrence that you can apply because there was nothing, no, no fruits of that, of that entry. As far as the, the, what I think is an unintentional misstatement, the only unintentional misstatement on the warrant affidavit was the source of their knowledge of the address, okay? The Sergeant DeGrange is talking to officers who are at Enterprise and they tell him that the defendant's address is 1513, and I don't remember the name of it, Rosemount, Rosemount Avenue, I think. And, and he assumes that because they're at Enterprise that they got that information from the Enterprise rental records when in fact they got that information from the defendant himself. You know, the true facts are even stronger than the facts, than the inadvertently wrong facts that they put in the, in the affidavit. So, and you only suppress in that situation if it's an intentional misstatement or rec, made with, with reckless disregard for the truth, and I don't think you can find that, and the district judge did not find it, and it's a factual finding, subject to review for clear error. And if the, if the, the misstatement is material, meaning it would affect the probable cause determination, well, where the defendant's address came from doesn't affect the probable cause determination. The address was the same, regardless, and that's the only thing that, that is crucial here. By what standard do we review the district court's finding that the question about the marks on the neck was not interrogation? Thank you, because I was getting ready to take my leave, to offer to sit down, but that is a question that you asked, that you asked my, my opponent, and I wrote down an answer. The standard is clear error. It's a factual determination. He agreed to that in his statement of the standard of review. I agreed with it. I cited cases from other circuits that hold that. The Velasquez case in this circuit treated it as a factual determinant, determination subject to plenary review in the, in the context of custodial. Subject to plenary review. Excuse me, excuse me. Subject to review for clear error. I thank you very much for correcting me, Your Honor. So I, I, I don't think there's any question. I don't think we had a disagreement over that. All right. Thank you. Thank you. I, if I'm, I'm inclined to sit down unless the court has any other questions for me. I do. I'm content. Thank you, Your Honors. Thank you, sir. I'll be very brief. I've already used up some of my time. I don't think Mr. Smith and I do disagree insofar as operative facts and whether it's reviewed by a plain error standard or whatnot. The judge found facts. The facts being with very subtle differences that the police officer asked the question, opened his mouth first, asked him about the suicide. I draw what I think are plenary review inferences from it. When you ask somebody about a suicide after bank robbery and he says, yes, I tried to commit suicide twice the night before. It's probative relevant evidence. It's an interrogation about the bank robbery. Take me through the effect of, take me through the effect. Suppose they violated Miranda. Suppose they didn't follow Miranda. What is the effect of that on this case? If they had followed Miranda? No. Let's assume you are correct, just hypothetically. And the interrogation, what you claim was interrogation, was inappropriate. What's the effect on this case? It should be suppression of the statements that he subsequently gave, including the letter to the tellers apologizing for robbing the bank. From that point forward. They wouldn't have had enough evidence to suppose they would retry him without that. Is there enough evidence to convict? I don't think so. What is the remaining evidence? Yeah, this was never a case where conviction was much as an issue as negotiation was the issue. We're not going to get into negotiation. No. I just want to get into the legal. What evidence then would be left of his culpability? The rental car, the fact that it was rented, the search of the home, and the evidence that was developed during the search of the home. The firearm? Yeah, the firearm that was found upstairs behind the wall when they searched the second time. That would be evidence. Assuming that that's not suppressible also. What's the connection of the firearm to the crime? I don't know, but I would presume that the tellers would be able to identify it because it had some unique wrapping of tape around the handle. So I think that would be the relevancy of it. But with that said, So it might not matter. What I'm trying to get at is the Miranda issue may not be dispositive. It was an important point. I spent a lot of time in criminal law and in negotiating. I know that. We know that. That was a very important point. The plea that was negotiated here was a 20-year binding plea on the court. And that was because he was facing 45 years because the evidence was so great against him. If you'd have gotten there a little earlier, I think this young man would be looking at about 15 or 12. That's the impact of it, the practical impact. I don't think anyone was going to work an acquittal here. The government was very aggressive in what it was pursuing. But I think as defense attorney, I wound up with a situation where there was nothing left to do except bury the body, so to speak. And that's where it came down to. And I would like to comment on the search because Mr. Smith and I do disagree on whether or not this was good police procedure. I spent several years as a prosecutor and the police should not go into somebody's home without a warrant. Arrest a young man that was painting in the home, a high school student, 16 years, take him outside, search him, then take him inside, retain him, look through the papers that are in the room. The young man saw that go upstairs and he heard them moving objects upstairs. A small house with two bedrooms upstairs, no doors, but where the gun was found was behind a plywood panel. The 16-year-old young man heard a thump when the officers were upstairs. And of course, there is no connection between that search and the subsequent warrant that was thought three hours later. But the officers weren't securing the premises. They left the premises. As a matter of fact, the boy's father and girlfriend both visited the premises after the police left. Was that sarcasm when you said if there's no, if the second search was independent of the first, and the only evidence offered against him was from the second search, you lose, right? Unless I could have drawn a connection between that first search and the second search, yes, I do lose. And I think the judge found that. He found that this was independent, that it didn't taint it. That all they found was the description of the house and the address of the house. And I would just emphasize one thing, and my time is up. That address is important. Mr. Smith and I disagree on the address too, because that warrant says the address came from the record of Enterprise Rental Car. It did not, and under standard law, it should be removed. There is no address on this warrant, at least a valid address that came from it. There's one according to Mr. Smith by incorporation. Yes, there was an incorporation, and the address that appeared in the affidavit, Your Honor, came from a corrupt source. It was not accurate. They said that address came from Enterprise. It demonstrably did not. Now, where they got the address, the magistrate was entitled to know. I know, but that kind of, you know, what do you call it, mistake or intentional is not the type of error that should be suppressed. Well, I think it is. I mean, they found Sergeant Lagrain was given bad information, but who was he given bad information by? And I can even be a little cynical and say, what was the motive? Well, because they took this information from him without giving him Miranda, so we didn't get the information from his statement. We got the information from the records, and frankly, they didn't. That was wrong, and that is the responsibility under a giglio analysis of the police. Maybe not Sergeant Lagrain, but the police generally. Thank you very much, Your Honor. Thank you, Mr. West. Thank you. Very well argued, as one would expect from the counsel. We'll take it under advisement. Well, I'd be interested in your views as to whether we have to CAV this pending the Supreme Court's decision in Corley. You better get on the tape. I'm sorry. Both of you. Would you like us both to come up? That's fine. I think you can stand next to each other. I'd be, well, we have nobody. Mr. West hired me, so we have no trouble standing. I know. I think we, my guess is we disagree. I think this case can be decided as it is because I don't think a reversal of Corley by the Supreme Court would affect this case for the reasons I expressed in my argument. That's why I am. Mr. West? And I think a reversal would affect it. And this is not some general statement. 3501 says it's a six-hour safe harbor. This is clearly outside the six-hour safe harbor and should be reassessed in light of whatever comes out of Corley. Okay. My client has lots of time, too. Okay, thanks. Thank you, Your Honor. Thank you.